# NORTHERN PACIFIC RAILWAY COMPANY *v.* TRODICK.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 117. Argued April 11, 1911.—Decided May 15, 1911.

Land within place limits of the Northern Pacific Land Grant Act of July 2, 1864, c. 217, 13 Stat. 365, actually occupied by a homesteader intending to acquire title, did not pass by the grant but were excepted from its operation, and no right of the railroad attached to such lands when its line was definitely located. *Nelson v. Northern Pacific Railway,* 188 U. S. 108.

Where a *bona fide* settler was in actual occupation of unsurveyed lands at the time of definite location of the line, the land occupied was excepted from the grant; and if, before survey, he sold his improvements to one who also settled on the land intending to apply for title under the homestead laws of the United States, the claim of the latter is superior to that of the railroad company notwithstanding the original settler had no claim of record.

A settler in actual occupation before the location of the definite line of

the railroad can stand upon his occupancy until the lands are surveyed, and his claim cannot be defeated by the railroad assuming without right at a date prior to his application to assert a claim to the lands.

Under the act of May 14, 1880, c. 89, 21 Stat. 140, delay on the part of a homesteader in making application after survey cannot be taken advantage of by one who had acquired no rights prior to the filing; and so *held,* that where the Northern Pacific land grant had not attached on account of actual occupation, delay on the part of the settler in filing after survey did not inure to the benefit of the company.

*Nelson* v. *Northern Pacific Railway Co.,* 188 U. S. 108, was not modified by *United States* v. *Chicago, Milwaukee & St. Paul Railway,* 218 U. S. 233, as to the rights of *bona fide* settlers which attached prior to definite location.

Where, by error of law, the Land Office incorrectly holds a party is entitled to patent and issues it, the courts can declare that the patent is held by the patentee in trust for the party actually entitled to have his ownership in the lands recognized.

THE facts, which involve the rights of settlers on the public lands and those of the Northern Pacific Railroad Company under the act of July 2, 1864, are stated in the opinion.

*Mr. Charles Donnelly,* with whom *Mr. Charles W. Bunn* was on the brief, for appellants.

*Mr. Thomas J. Walsh* for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

In this suit, involving the title to the southeast quarter of section 35, township 15 north, range 4 west, in the State of Montana, the defendants McDonald and Auchard, now co-appellants, claim title under patent issued by the United States to the Northern Pacific Railway Company, successor to the Northern Pacific Railroad Company to which a grant of lands was made by the act of Congress of

July 2, 1864. 13 Stat. 365, c. 217. The plaintiff Trodick, now appellee, seeks to obtain a decree adjudging that the title, under the patent, be held in trust for him, his contention being that he is the real, equitable owner of the land by virtue of the homestead laws of the United States, and that no patent therefor could rightfully have been issued to the railroad company. The Circuit Court of the United States dismissed the bill with costs to defendants. But the Circuit Court of Appeals reversed the decree with directions to give judgment for the plaintiff.

The facts in the case are few and are substantially undisputed.

By the third section of the act of 1864, Congress made a grant of public lands to the Northern Pacific Railroad Company in these words (so far as it is necessary to state them): "That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption, *or other claims or rights*, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time [of definite location], any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-

empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections." 13 Stat. 365, 368.

The company filed its map of definite location on July 6, 1882, but one Lemline was then in the actual occupancy of the land as a residence. He settled upon it in 1877 and thereafter made claim to it as his homestead, intending from the outset to acquire title under the laws of the United States as soon as the land was surveyed. He continuously resided on the land until his death, which did not occur until 1889. A short time prior to his death Lemline sold the improvements he had made on the land to the plaintiff Trodick. This he had the right to do, although he did not hold the title. *Bishop of Nesqually* v. *Gibbon*, 158 U. S. 155. The latter took possession of the land on the death of Lemline. The lands had not been surveyed when Lemline died or when Trodick went into possession. They were not surveyed until August 10, 1891. Trodick applied on January 10, 1896, to make homestead entry of the land, but his application was rejected "without prejudice to his right to apply for a hearing to determine the status of the land, July 6th, 1882, when the right of the company became effective." In the letter or opinion of the Commissioner of the Land Office, addressed to the local Register and Receiver, under date of December 24, 1898, it was said: "He [Trodick] applied for a hearing August 10, 1896, whereupon notice issued citing the parties in interest to appear at your office September 21, 1896. The hearing was continued from time to time until April 16, 1897, when both parties were represented. It appears from the evidence adduced that one Martin Lemline established his residence on the land, with his family, in 1877, continued to reside there until his

death, some time in 1891, and his improvements on the premises were of the estimated value of $1,000. Mr. Trodick settled on the land in 1891, and since then has continuously resided there. The material question for determination in this case is this: Did the settlement claim of Mr. Lemline *except the land from the operation of the grant* to the company? It is undoubtedly true that the land was occupied by Mr. Lemline when the right of the company attached, that he was qualified to make entry of the same and settled there with the intention of doing so, as the circumstances indicate. Had he lived until the plat of survey was filed in your office, he or his wife would, without doubt, have been allowed to perfect the claim by them initiated prior to July 6, 1882. Since Mr. Lemline had no claim *of record*, and the claim of Trodick had its inception subsequent to the definite location of the road, it must be held that the land inured to the grant. (*N. P. R. R. Co.* v. *Colburn*, 164 U. S. 383.) Your action is therefore approved and the application of Trodrick is accordingly rejected, subject to the usual right of appeal within sixty days."

In 1896 the railroad company contracted to sell the land to Auchard, and in 1899 conveyed to him by warranty deed. Subsequently, January 10, 1903, a patent was issued to the railroad company.

The former decisions of this court clearly sustain the decree rendered by the Circuit Court of Appeals. According to the provisions of the act of 1864, the railroad company could not acquire any vested interest in the granted lands—even such as were within the primary or place limits—until it made a definite location of its line, evidenced by an accepted map of location; nor would such location be of any avail as to lands, even in place limits, which, at the time of definite location, were occupied by a *homestead settler* intending, in good faith, to acquire title under the laws of the United States. Lemline, we

have seen, was in the actual occupancy of the lands as a homestead settler when the railroad company definitely located its line.   Therefore, the lands *did not pass* by the grant of 1864, *but were excepted from its operation,* and no right of the railroad *attached* to the lands when its line was definitely located.

In *St. Paul & Pacific* v. *Northern Pacific,* 139 U. S. 1, 5, a case arising under the Northern Pacific grant of 1864, it was distinctly held that "land which *previously to definite location* had been reserved, sold, granted or otherwise appropriated, or upon which there was a preëmption 'or other claim or right' *did not pass by the grant* of Congress." In *United States* v. *Northern Pacific R. R. Co.,* 152 U. S. 284, 296, the court, referring to the same grant, said: "The act of 1864 granted to the Northern Pacific Railroad Company *only* public land, . . . free from preemption or other claims or rights *at the time its line of road was definitely fixed* and a plat thereof filed in the office of the Commissioner of the General Land Office."

In *Northern Pacific R. R.* v. *Sanders,* 166 U. S. 620, 629, it was said that the act of July 2, 1864, under which the railroad company claims title *excluded* from the grant "all lands that were not, *at the time the line of the road was definitely fixed,* free from preëmption or other claims or rights."

In *United States* v. *Oregon &c. R. R.,* 176 U. S. 28, 50, the court held that the "Northern Pacific Railroad Company could take no lands except such as were *unappropriated* at the time its line was definitely fixed."

In *Nelson* v. *Northern Pacific Railway,* 188 U. S. 108, 121–124, 130, the court again construed the act of 1864. That was the case of one who went upon and occupied certain lands, within the place limits, before the definite location of the railroad line, with the *bona fide* purpose to acquire title under the laws of the United States.   This court said: "It results that the railroad company did not

acquire any *vested* interest in the land here in dispute in virtue of its map of general route or the withdrawal order based on such map; and if such land was not 'free from preëmption or other claims or rights,' or was 'occupied by homestead settlers' at the date of the definite location on December 8, 1884, it did not pass by the grant of 1864. Now prior to that date, that is, in 1881, Nelson, who is conceded to have been qualified to enter public lands under the homestead act of May 20, 1862, went upon *and occupied this land*, and has continuously *resided* thereon. The land was not surveyed until 1893, but as soon as it was surveyed he attempted to enter it under the homestead laws of the United States, but his application was rejected, solely because, in the judgment of the local land officers, it conflicted with the grant to the Northern Pacific Railroad Company. He was not a mere trespasser, but went upon the land in good faith, and, as his conduct plainly showed, with a view to residence thereon, not for the purposes of speculation, and with the intention of taking the benefit of the homestead law, by perfecting his title under that law, whenever the land was surveyed. And for fourteen years before the railroad company by an *ex parte* proceeding, and without notice to him, so far as the record shows, obtained from the Land Office a recognition of its claim, and for sixteen years before this action was brought, he maintained an actual residence on this land. It is so stipulated in this case. As the railroad had not acquired any vested interest in the land when Nelson went upon it, *his continuous occupancy of it, with a view, in good faith, to acquire it under the homestead laws as soon as it was surveyed*, constituted, in our opinion, a *claim* upon the land within the meaning of the Northern Pacific Act of 1864; and as that claim existed *when the railroad company definitely located its line*, the land was, by the express words of that act, *excluded from the grant*." Again, in the same case, there appear these pertinent observations, ap-

plicable in the discussion here: "If it be said that Nelson's claim was that of mere occupancy, unattended by formal entry or application for the land, the answer is that that was a condition of things for which he was not in anywise responsible, and his rights, in law, were not lessened by reason of that fact. *The land was not surveyed until twelve years after he took up his residence on it, and under the homestead law he could not initiate his right by formal entry of record until such survey.* He acted with as much promptness as was possible under the circumstances. . . . So far we have proceeded on the ground that as the act of 1864 granted to the railroad company the alternate sections to which at the time of definite location the United States had full title, not reserved, sold, granted or appropriated, *and* which were *free* from preëmption or other claims or rights at date of definite location, and authorized the company to select other lands in lieu of those then found to be 'occupied by homestead settlers,' Congress *excluded from the grant* any land so occupied with the intention to perfect the title under the homestead laws whenever the way to that end was opened by a survey."

To the same effect are numerous decisions in the Land Department by different Secretaries of the Interior. Those decisions are cited in the *Nelson Case*, 188 U. S. 126 to 131.

In view of the authorities cited, it must be taken that by reason of Lemline's actual occupancy of them as a *bona fide* homestead settler, at the time of the definite location of the railroad line, these lands were *excepted from the grant* and the railroad company did not acquire and could not acquire any interest in them *by reason of such location.* So that the issuing of a patent to it in 1903, based on such location, was wholly without authority of law. So far as the railroad company was concerned, the way was open to Trodick, who had purchased the improvements from Lemline and was in actual possession of the lands as a residence, to carry out his original purpose to make appli-

cation to enter them under the homestead laws, and thus acquire full technical title in himself. He made such an application in 1896, the railroad company not having at that time any claims whatever upon the land; for it acquired nothing, as to these lands, by the definite location of its line. He was admittedly qualified to enter lands under the laws of the United States, but his application was disregarded solely on the ground that, when the railroad line was definitely located, Lemline had no claim "of record," and Trodick's application to the Land Office was after the date of such location. This was error of law, as the authorities above cited—particularly the *Nelson Case* —show. Lemline's entry and occupancy did not need, as between himself and the railroad company, to be evidenced by a record of any kind, for the reason, if there were no other, that the lands which he settled upon with the purpose of acquiring title under the laws of the United States, had not at that time been surveyed. He was not responsible for the delay in surveying, any more than was the homesteader in the *Nelson Case*, for the neglect to survey. He was entitled under the circumstances, having made his application in proper form, and the railroad company having acquired no interest under the definite location of its line, to wait until the land was surveyed and in the meantime to stand upon his occupancy, accompanied, as such occupancy was, with a *bona fide* intention to acquire title and to reside upon the lands. His claim on the land could not be postponed or defeated by the fact that the railroad company had assumed, without right, at a prior date, to assert a claim to the lands as having passed by the grant and to have become its property, on the definite location of its line.

Some reliance is placed on the delay occurring after the survey of the lands before Trodick made his homestead application—the statute of May 14, 1880, c. 89, 21 Stat. 140, prescribing a certain period within which the home-

steader should act after the survey of the lands.· But that delay was immaterial as affecting the rights of the homestead applicant, because no rights of others had intervened intermediate the survey and Trodick's formal application. A similar question arose in *Whitney* v. *Taylor,* 158 U. S. 85, 97, and it was thus disposed of: "It is true that § 6 of the act of 1853 (10 Stat. 246) provides 'that where unsurveyed lands are claimed by preëmption, the usual notice of such claim shall be filed within three months after the return of the plats of surveys to the land offices.' But it was held in *Johnson* v. *Towsley,* 13 Wall. 72, 87, that a failure to file within the prescribed time did not vitiate the proceeding, neither could the delay be taken advantage of by one *who had acquired no rights prior to the filing.* As said in the opinion in that case (p. 90): 'If no other party has made a settlement or has given notice of such intention, then no one has been injured by the delay beyond three months, and if at any time after the three months, while the party is still in possession, he makes his declaration, and this is done *before any one else has initiated a right of preëmption by settlement or declaration,* we can see no purpose in forbidding him to make his declaration or in making it void when made. And we think that Congress intended to provide for the protection of the first settler by giving him three months to make his declaration, and for all other settlers by saying if this is not done within three months any one else who has settled on it within that time, or at any time before the first settler makes his declaration, shall have the better right.' See also *Lansdale* v. *Daniels,* 100 U. S. 113, 117, where it is said: 'Such a notice, if given before the time allowed by law, is a nullity; but the rule is otherwise where it is filed subsequent to the period prescribed by the amendatory act, as in the latter event it is held to be operative and sufficient unless some other person had previously commenced a settlement and given the required notice of claim.' The delay in filing, therefore, had

no effect upon the validity of the declaratory statement."
In *McNeal's Case,* 6 L. D. 653, Secretary Vilas referred to
the act of May 14, 1880, 21 Stat. 140, which related to set-
tlers on public lands and provided that their rights should
relate back to the date of settlement, the same as if he set-
tled under the preëmption laws. The entry in that case
was cancelled by the Commissioner. The Secretary said:
*"There being no intervening claim,* I see no reason why his
rights may not relate back to the time of his settlement,
even though he did not file for the land within three
months thereafter in strict accordance with the require-
ments of the act of May 14, 1880." We may add that the
Commissioner of the General Land Office made no objec-
tion, in this case, to Trodick's application on the ground
of his delay in making formal application. His decision,
in effect, conceded that the application was not objection-
able and was not to be denied, except on the ground that
Lemline, who preceded Trodick in interest, had no claim
*"of record"* and that Trodick's formal application was not
made until after the location of the railroad line. It is
not for the railroad company to which was wrongfully
issued a patent to make an objection to Trodick's claim
which the Land Office would not make. The authorities
cited show that the grounds assigned by the Commissioner
were wholly untenable, as matter of law, in that he assumed
that the railroad company accquired an interest in the
land by the mere location of its line when Lemline was, at
the time, in actual occupancy as a homestead settler.

Attention is called to the decision at the present term
of *United States* v. *Chicago, Milwaukee & St. Paul Ry.,*
218 U. S. 233. That case, it is contended, is authority
for the proposition that the railroad company, upon the
definite location of its line, under a land grant act, ac-
quired a vested interest in the lands granted, unless there
was at the time some claim on the land "of record." It is
true the opinion in that case referred to the stipulation be-

tween the parties, to the effect that, at the time of the definite location of the road, "none of the lands described in the bill of complaint had been covered by any homestead entry, preëmption, declaratory statement or warrant location or other existing claims of record in the office of the Commissioner of the Land Office," and then proceeded: "In that view, and if this were the whole case, then, beyond all question, the law would be in favor of the railway company; for the grant of 1864 was one *in præsenti* for the purposes therein mentioned, and according to the settled doctrines of this court, the beneficiary of the grant was entitled to the lands granted in place limits which had not been appropriated or reserved by the United States for any purpose, or to which a homestead or preëmption right had not attached *prior to the definite location of the road* proposed to be aided. The grant plainly included odd-numbered sections, within ten miles on each side of the road, which were part of the public domain, not previously appropriated or set apart for some specific purpose at the time of the definite location." The above words "of record," it is supposed, show that the court intended to modify the doctrine that a *bona fide* settlement upon unsurveyed lands, within place limits, which were entered upon and occupied in good faith as a residence, before the railway company located its line, with the intention of acquiring title, after such lands shall have been surveyed, gave the homesteader a "claim" on the lands which excepted them from the grant to the railroad company. But this is an error. The words referred to were only intended to describe one class of the claims, the attaching of which to lands specified in an act of Congress, prior to definite location, had the effect to except them from the granting act. There was no purpose to modify the principles of the *Nelson Case.*

It will serve no useful purpose to extend this discussion of the cases cited, on behalf of the company, which, it is

alleged, distinguish this from the *Nelson Case*. The facts bring the present case within the ruling of that case, and we adhere to the principles there announced.

We are of opinion that as between the railroad company and the appellee the latter has the better right to the land, and that the Land Office incorrectly held that the company was entitled to a patent. That was an error of law which was properly corrected by the reversal in the Circuit Court of Appeals of the decree of the Circuit Court, with directions to render a final decree recognizing Trodick's ownership of the lands in controversy and adjudging that the title, under the patent was held in trust for him. The judgment of the Circuit Court of Appeals is

*Affirmed.*